# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-07-00364-CV

---

**Terry and Phyllis Price, Michaela Watson, and Robert L. Mays, Jr., Appellants**

**v.**

**Philip Schroeder, Bill Smith, Jerry Beene, Leroy Harrington, Reagan Hill, Jerry Mitchell, Gary Moore, Tony Silva, Martin Ramsay, Johnnie Terrazas, Ray Wainner, John Watson, David Beene, A. V. Welsh, and First Baptist Church of Bulverde, Appellees**

---

### FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT
### NO. C2005-1386A, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Terry and Phyllis Price sued their former church, the First Baptist Church of Bulverde ("the Church"), for access to the Church's books and records. *See* Tex. Rev. Civ. Stat. Ann. art. 1396-2.23 (West 2003) (members of nonprofit corporation have right to inspect corporation's books and records). The Prices alleged that while the Church allowed them limited access to its books and records, it did not allow them sufficient access to conduct a full audit. The Church filed a special appearance and plea to the jurisdiction, arguing that the Prices lacked standing and the Price's suit implicated ecclesiastical matters beyond the trial court's jurisdiction. The Prices subsequently added Michaela Watson, a personal friend and active member of the Church, as a co-plaintiff. The trial court granted the Church's plea to the jurisdiction regarding the Prices' claims but allowed Watson's claims to proceed. The Prices then filed a new suit against individual deacons

of the Church, seeking damages under various tort theories. The Church intervened in the suit against the deacons because it had agreed to indemnify them. The two suits were consolidated, and the Church and the deacons eventually moved for summary judgment on all claims against them. The trial court granted the summary judgment motions and also granted defendants' motions for sanctions against the Prices and their attorney. The Prices, their attorney, and Watson appeal the summary judgments and sanctions awards. We will affirm in part and vacate in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Prices were members of the Church for several years. They eventually disagreed with various ecclesiastical and secular Church policies, including how the Church handled its finances. In September 2004, the Prices requested access to the Church's financial books and records, which the Prices were entitled to review because the Church was a registered non-profit corporation. *See id.* (members of corporation have right, on written demand and for proper purpose, to examine and copy corporation's books and records). The Prices made a second request to examine the Church's books and records on March 31, 2005, this time through a letter drafted by their attorney, Robert L. Mays, Jr. ("Mays").

On April 3, 2005, in accordance with its bylaws and Constitution, the Church terminated the Prices' membership. The Church maintains that this action was not the result of the Prices' financial inquiries, but rather of the Prices' longstanding and increasingly vehement disagreements with the Church's ecclesiastical doctrines. The Church alleges it had made many efforts over the years to address the Prices' concerns, including arranging for special meetings with an independent mediator, but ultimately these efforts failed. The Church's members voted to remove

the Prices as members on April 3, 2005. The Church allowed the Prices and Mays to examine the Church's books and records on April 5, 2005, two days after the Prices' membership was terminated.

On April 12, 2005, Mays sent a letter to the Church's attorney, Amy Benavides, stating that the April 5 examination convinced him that a "complete audit of the church records is necessary." Mays requested that the Church turn over financial records for the period from 2002 through 2005 so that Mays could submit them to an accountant for a complete audit. On April 14, 2005, Mays allegedly told Benavides that the Prices' main concern was how the Church had disposed of a donation the Prices made to the Church's building fund in 1997.[1] Accordingly, on April 28, 2005, Benavides sent Mays a letter stating that the Prices' audit request was "not only beyond what is required by [Tex. Rev. Civ. Stat. art. 1396-2.23], but would fail to shed light on Mrs. Price's stated concern." Benavides's letter stated that the Church would be willing to attempt to locate records related to the Prices' 1997 building-fund donation, but otherwise the Church believed that it had discharged its legal duties.

The Prices did not take the Church up on its offer to locate additional records related to the Prices' 1997 building-fund donation. Rather, on April 26, 2005, the Prices filed suit against the Church. Their petition alleged that while they had been allowed to view the Church's records on April 5, they had not been allowed to copy them. Their petition initially requested that the court

---

[1] The Church asserts that Mays made this admission in a letter he sent to Benavides on April 14, 2005, but that letter is not in the record. The record does show, however, that on March 31, 2005, Mays sent Benavides a letter that stated: "Mrs. Price . . . . is concerned that funds that have been donated for the building fund have been spent for other purposes." Similarly, in his April 12 letter summarizing the "significant discrepancies" allegedly discovered during the April 5 inspection, Mays stated that "Mrs. Price . . . was and remains concerned that funds that have been donated for the building fund have been spent for other purposes."

3

order the Church to produce its 2003, 2004, and 2005 records for copying, but it later requested simply that the Court "order an audit" of those records. The petition variously stated that the purpose of the audit was "to verify that [the Church's] expenditures are for Church-related purposes," "to determine whether or not the acts of the pastor and the Board of Deacons are illegal, oppressive, or fraudulent," and "to determine whether or not corporate assets have been misapplied or wasted."

The Prices served their petition on Cheryl Hallonquist, the Church's former treasurer and registered agent for service of process. Hallonquist had stopped attending the Church after moving from Bulverde to San Antonio some years earlier. The Prices were personal friends of Hallonquist and served her at a San Antonio address rather than the Bulverde address that was listed in the Secretary of State's records due to an oversight by the Church. The Church maintains that Hallonquist did not inform anyone at the Church about the lawsuit and that it did not learn about the lawsuit until after a visiting trial court judge entered a default order on May 25, 2005 granting the relief requested by the Prices' petition. The default order required the Church to produce financial records for 2002 through 2005 as well as other information, including "the audio tape recording on April 3, 2005 in which Terry Price and Phyllis Price were purportedly excommunicated from the Church." The Prices served the order on the Church's deacons at their homes.

On June 6, 2005, the Church filed a special appearance that argued the Church was not subject to the court's jurisdiction because it had never been properly served with the petition. On the same day, the Church also filed a motion to vacate the May 25, 2005 audit order and a plea to the jurisdiction that argued (1) the information sought by the Prices was ecclesiastical and therefore outside the court's jurisdiction and (2) the Prices lacked standing because their church membership was terminated before they filed suit.

4

On July 5, 2005, the Prices filed an amended petition that added Watson, a friend of the Prices and member of the Church, as a co-plaintiff. In addition to the facts alleged in the Prices' original petition, the amended petition alleged that on April 4, 2005, Watson had orally requested access to the Church's books and records and was told that she had to submit a written request. *See id.* (request for access to corporation's books and records must be in writing). The amended petition also alleged that "[a]s of June 25, 2005, Plaintiff Watson had not been granted inspection of the Church records." The petition attached an affidavit, signed by Watson on June 29, 2005, that stated: "I request access to the Church records and I request that the court order an audit of the financial affairs of the Church for the past three (3) years."

On July 22, 2005, the Church withdrew its special appearance.

On August 26, 2005, Church counsel sent a letter to Mays proposing that rather than producing its financial records, the Church could turn over its financial records to an independent accountant to be audited at the Church's expense. Mays rejected this proposal in a letter he sent the same day, calling it "completely unacceptable" and threatening to file a motion to compel production and a motion for sanctions if the Church did not hand over "all of [its] records" within a week.

On August 31, 2005, the trial court granted the Church's motion to vacate the May 25, 2005 audit order and also granted the Church's plea to the jurisdiction. Without explaining the basis of its order, the court dismissed the Prices "for want of jurisdiction" but left Watson's causes of action intact. The same day, the parties filed an agreed protective order that required Watson to keep confidential any financial records produced by the Church. Among other things, this protective order prevented Watson from sharing the Church's financial records with non-parties.

5

On September 1, 2005, the Church sent a letter to Mays in which it agreed to make its records available to Watson for copying. Nevertheless, on September 9, 2005, Watson filed a motion to compel the production of those records. The motion requested a wide range of records, including the Church's constitution. On September 26, 2005, the Church produced approximately 1400 pages of financial records. Finding this production inadequate, Watson filed a second motion to compel on October 28, 2005 that also included a request to dissolve the August 31, 2005 protective order.

Around this time, the Church alleges that the Prices made out a check to the Church and had someone place it under a desk in a Church office. The Church returned the check to the Prices.

On December 15, 2005, a visiting judge granted Watson's motion to compel production and also modified the parties' protective order to allow Watson to disclose the Church's financial records to any other Church member. The visiting judge's order gave the Church until January 15, 2006 to produce the records. It also gave Watson permission to join the deacons as parties if the Church failed to produce the records by January 15.

On December 27, 2005, the Prices, with Mays still acting as their attorney, filed a second lawsuit, this time naming the individual deacons of the Church as defendants. The second suit alleged that (1) the deacons themselves had denied the Prices access to the Church's books and records; (2) the Prices' monetary donations to the Church "were not used for their intended purposes"; (3) the deacons, jointly and severally, had "misappropriated and converted" the Prices' donations of money and property; and (4) the deacons had "excommunicated" the Prices for seeking

6

access to the Church's financial records. The lawsuit listed causes of action for conversion, breach of fiduciary duty, misapplication of fiduciary property, and fraud.

On January 13, 2006, the Church filed a motion in the first lawsuit that asked the trial court to reconsider the visiting judge's December 15, 2005 order. The Church argued that the order was unduly burdensome because the Church had proposed a simpler alternative to the required production, namely, an independent audit, and overly broad because Watson had not identified specific gaps in the records produced by the Church on September 26, 2005. The Church also argued that the December 15 order violated Texas Revised Civil Statutes article 1396-2.23 in that the way it modified the parties' protective order would allow non-party Church members to review the Church's financial records without first making a written demand for them and stating a proper purpose. *See id.* (request for access to corporation's books and records must be in writing and state proper purpose).

On January 17, 2006, Watson filed a motion requesting sanctions for the Church's failure to produce documents in accordance with the December 15, 2005 order. Watson's motion also requested sanctions against the Church's pastor and deacons "because the Church acts through its pastor and deacons."

Also on January 17, 2006, the individual deacons, represented by attorney Joseph Mastrogiovanni, Jr., filed an answer in the second lawsuit. They generally denied the Prices' allegations and asserted (without elaboration) that the Prices lacked capacity to sue. They also counterclaimed for sanctions under chapter 10 of the Texas Civil Practice and Remedies Code,

7

alleging that the Prices had sued in bad faith and solely for harassment.[2] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 10.001 (claims must be presented for proper purpose), .002 (court may award sanctions for violations of § 10.001) (West 2002).

On January 30, 2006, the Church filed a motion to intervene in the second lawsuit, asserting that intervention was proper because it had agreed to indemnify the deacons.

On February 1, 2006, the trial court held a hearing on the motions pending in the first lawsuit (namely, Watson's motion for sanctions and the Church's motion for reconsideration of the December 15, 2005 order). The court indicated that it would deny Watson's motion, grant the Church's motion, and order the case abated while an independent audit was conducted. The court also indicated that it would initially require the Church to pay for the audit but might shift the cost to Watson if the audit uncovered no wrongdoing.

The court did not enter orders formalizing these oral rulings for some time. Before it did so, the Church amended its answer in the first lawsuit to include counterclaims for libel and slander, conspiracy to interfere with business relations, business disparagement, and sanctions. The Church alleged that the Prices continued to be the driving force behind Watson's suit, even paying her legal bills, and that Watson was merely acting as their agent in continuing to press the suit.

---

[2] The deacons' answer actually cited "Rule 13 of the Texas Civil Practice and Remedies code." That was clearly a typographical error; the Civil Practice and Remedies Code contains chapters and sections, not "rules," and chapter 13 deals with affidavits of inability to pay costs, which have nothing to do with this case. Chapter 10, on the other hand, deals with sanctions for improper pleadings. Alternatively, the deacons may have intended to cite Rule 13 of the Texas Rules of Civil Procedure, which also deals with sanctions. *See* Tex. R. Civ. P. 13. In any event, the Prices did not object to the deacons' error, and, as discussed below, the deacons eventually moved for sanctions under both chapter 10 of the Civil Practice and Remedies Code and Rule 13 of the Rules of Civil Procedure. Thus, the deacons' mistake was immaterial.

8

On March 8, 2006, the trial court entered an order formalizing several of its bench rulings from the February 1 hearing. The March 8 order fully reinstated the parties' protective order, denied Watson's motion for sanctions, ordered an independent audit of the Church's financial records, and ordered that Watson would pay for the audit if it did not reveal fraud. On May 10, 2006, the Court entered a complementary order that abated the lawsuit until the audit was completed.

On August 3, 2006, the audit was completed. It revealed some gaps in the Church's records but no fraud. Consequently, on November 13, 2006, the Church filed a motion to require Watson to reimburse its audit expenses, which totaled $21,380.08. The same day, the Church filed a motion for summary judgment against Watson. The Church styled its motion as both a traditional and no-evidence motion. *See* Tex. R. Civ. P. 166a(c), (i). The Church argued that (1) the trial court lacked subject matter jurisdiction over Watson's suit because it implicated ecclesiastical matters; (2) the audit conclusively established that the Church had not engaged in wrongdoing; (3) Watson had produced no evidence that she suffered an injury or that the Church had violated any duty; and (4) Watson lacked standing and failed to allege a viable cause of action.

On November 20, 2006, the Church and the individual deacons jointly moved for summary judgment in the second lawsuit. They again styled the motion as both a traditional and no-evidence motion. *See id.* They alleged that (1) the trial court lacked subject-matter jurisdiction over the Prices' second lawsuit because it implicated ecclesiastical matters; (2) the Prices lacked standing because their Church membership was terminated before they filed suit; (3) the Prices produced no evidence to support their conversion claim; (4) the Prices produced no evidence that the deacons held, much less breached, a fiduciary responsibility to the Prices; (5) there is no civil cause of action

9

for misapplication of fiduciary property; (6) the Prices produced no evidence to support any element of their fraud claim; and (7) the audit conclusively established that the Church had not committed fraud.

On November 28, 2006, just days before the court was to hold a hearing on the pending summary-judgment motions, the Prices and Watson jointly filed a second amended petition that was intended to operate in both lawsuits. The petition asserted that Watson had been denied access to the Church's books and records.[3] It also asserted that the audit had "revealed numerous irregularities." The second amended petition sought a declaration that the Church and the deacons had violated Texas Revised Civil Statutes article 1396-2.23(A). It also alleged causes of action for breach of contract, negligence, gross negligence, conversion, breach of fiduciary duty, and intentional infliction of emotional distress.

On December 26, 2006, the individual deacons and the Church both filed amended summary judgment motions in response to the second amended petition. Like their previous motions, their new motions were styled as both traditional and no-evidence motions.

On January 8, 2007, the Prices and Watson filed several motions that were intended to operate in both lawsuits. First, they filed motions to set aside or reconsider the order that required them to pay for the audit.[4] Second, they moved to consolidate the first and second lawsuits, stating

---

[3] The petition made this denial even though, as discussed above, the Church had produced roughly 1400 pages of financial documents and granted unfettered access to its financial records to an independent auditor.

[4] Though the trial court initially ordered the audit as part of Watson's lawsuit, it ended up holding both Watson and the Prices liable for the cost of the audit after the two lawsuits were consolidated.

that "[t]he issues of fact and law in both district court actions are the same, namely the conduct of the financial matters of the Church and the access of Church members to the information." Third, they requested a continuance of the hearing on the defendants' summary-judgment motions to conduct additional discovery. Fourth, and related, they moved to resume discovery, which the trial court had abated while the audit was being conducted. Fifth, they filed a response to the Church's and individual deacons' summary-judgment motions. They argued that (1) their lawsuits did not implicate ecclesiastical matters; (2) the evidence submitted in support of the summary-judgment motions was inadmissible hearsay; (3) the auditor of the Church's records had not filed an affidavit as required by Texas Rule of Civil Procedure 172; (4) no-evidence summary judgment was improper because there had been insufficient time for discovery; and (5) the Church and deacons had not conclusively established a right to judgment as a matter of law. In support of this response, the Prices and Watson attached affidavits by Terry and Phyllis Price that purported to support the causes of action contained in the second amended petition.

On January 11, 2007, the individual deacons filed an objection to the Prices' affidavits, characterizing them as conclusory, irrelevant, and insufficient because they failed to differentiate between the deacons (in other words, because they addressed the deacons as a group and stated no specifics about how any particular deacon had allegedly acted wrongfully).

On February 14, 2007, the trial court held a hearing to entertain the numerous pending motions. The court granted the Prices' and Watson's motion to consolidate, *see* Tex. R. Civ. P. 174(a), but it denied their motion for continuance, motion to resume discovery, and motions to

11

reconsider and set aside the order shifting audit expenses. The court granted the Church's and individual deacons' motions for summary judgment and motion to refund audit expenses.[5]

On March 26, 2007, the Church and deacons moved for sanctions against the Prices under Texas Rule of Civil Procedure 13 and Texas Civil Practice and Remedies Code chapter 10. They argued that the Prices' lawsuits were frivolous, groundless, and brought in bad faith as a form of retaliation. They also argued that the Prices, through Mays, had used unwarranted delay tactics and misrepresented facts to the court. The Church and deacons requested sanctions equal to their costs and attorney's fees. They submitted affidavits by the Church's attorney, Benavides, and the deacons' attorney, Mastrogiovanni, that stated the amount of fees they had billed their clients.

On March 28, 2007, the Prices and Watson filed a response to the motion for sanctions, arguing that (1) attorney's fees were not a statutorily recognized measure for sanctions; (2) the Church and deacons did not present evidence of their attorney's fees at the hearing on their summary-judgment motions; (3) many of the exhibits submitted in support of the sanctions motion were hearsay, including the audit report, which also lacked the statutorily required supporting affidavit by its author, *see* Tex. R. Civ. P. 172(a); (4) as a Church member, Watson was entitled to seek an accounting; and (5) the affidavits of attorney's fees were defective and conclusory.

On April 5, 2007 the court held a hearing on the sanctions motion. Benavides and Mastrogiovanni testified as to their fees, and the court awarded them their fees as well as all costs

---

[5] The court made these rulings at the February 14 hearing. It formally signed the order granting the summary-judgment motions and motion for refund of audit expenses on March 28, 2007. It signed orders denying the Prices' and Watson's motion for continuance, motion to resume discovery, and motions to reconsider or set aside the order shifting audit expenses on April 5, 2007.

12

incurred by the Church and deacons. The court held the Prices and Mays, but not Watson, jointly and severally liable for the defendants' fees and costs. Mays objected to being held liable, arguing that holding him liable along with the Prices was beyond the scope of relief requested by the sanctions motion. The court overruled his objection because the sanctions motion specifically requested "all . . . relief of law and equity to which defendants may be justly entitled" under Texas Rule of Civil Procedure 13 (which, the court noted, "contemplates sanctioning of the lawyer").

On April 25, 2007, the Prices and Watson filed a motion for a new trial. They alleged that (1) the Church had adduced no evidence that Watson's suit was improper; (2) the law should be changed so that former members of churches (like the Prices) have standing to review their former churches' books and records; (3) the Prices' lawsuits did not implicate ecclesiastical matters; (4) the defendants did not carry their summary-judgment burden of demonstrating that there were no material issues of fact, at a minimum because whether a dispute is secular or ecclesiastical is a fact-intensive inquiry; (5) the court had no authority to make the Prices pay for the audit of the Church's books and records; (6) plaintiffs were denied a sufficient opportunity to conduct discovery to uncover wrongdoing; (7) plaintiffs were denied due process by having an insufficient opportunity to conduct discovery; (8) the Church did not present competent evidence of what the audit actually cost; (9) the Church and deacons presented no evidence that they actually incurred attorney's fees, because their attorneys were paid by an insurance company; (10) the Church was required but failed to segregate its attorney's fees between the two lawsuits; (11) the trial court should not have made Mays jointly and severally liable for the Price's attorney's fees because the defendants did not name Mays as a target of their sanctions motion; (12) the plaintiffs demonstrated a good-faith basis for

13

their lawsuits under a joint-enterprise theory; and (13) the defendants were not entitled to sanctions because they could have mitigated their losses by providing the plaintiffs access to the Church's books and records. On May 23, 2007, the Prices and Watson supplemented their motion for a new trial with claims that their constitutional rights had been violated.

On June 1, 2007, the Church filed a response to the plaintiffs' motion for new trial. The Church argued that the motion was an attempt to relitigate issues that the court had already resolved, and it requested additional sanctions in an amount equal to the attorney's fees and costs incurred to respond to the motion. On June 6, 2007, the court held a hearing at which it took the motion for new trial and motion for sanctions under advisement. On July 7, 2007, 75 days after it was filed, the plaintiffs' motion for new trial was overruled by operation of law. *See* Tex. R. Civ. P. 329b(c). The trial court's plenary power expired on August 8, 2007, 30 days later. *See id*. 329b(e). The court nevertheless issued an order denying the motion for new trial and granting the motion for sanctions on August 23, 2007.

The Prices, Watson, and Mays filed this appeal on June 25, 2007. They filed an amended appeal on September 11, 2007 after the trial court issued the order purporting to deny their motion for new trial and grant the additional sanctions. The amended appeal claimed to be appealing the trial court's "void" order of August 23, 2007.

## STANDARD OF REVIEW

A "traditional" motion for summary judgment is properly granted when the movant establishes that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471

14

(Tex. 1991); *Holmstrom v. Lee*, 26 S.W.3d 526, 530 (Tex. App.—Austin 2000, no pet.). A defendant seeking summary judgment must negate as a matter of law at least one element of each of the plaintiff's theories of recovery or prove as a matter of law each element of an affirmative defense. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

A party seeking a "no-evidence" summary judgment, on the other hand, does not bear the burden of establishing its right to judgment by proving a defense or claim, but instead asserts that there is no evidence of one or more essential elements of a claim on which the opposing party will have the burden of proof at trial. Tex. R. Civ. P. 166a(i); *Holmstrom*, 26 S.W.3d at 530. If the nonmovant fails to produce more than a scintilla of probative evidence raising a genuine issue of material fact as to each challenged element on which he has the burden of proof, summary judgment is proper. *Id*.

In reviewing a grant of summary judgment, we take as true evidence favorable to the nonmovant, making every reasonable inference and resolving all doubts in the nonmovant's favor. *Centeq Realty*, 899 S.W.2d at 197. If the trial court's order does not specify the grounds for granting summary judgment, we must affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

We review de novo the grant of a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Whether a court has subject matter jurisdiction is a question of law. *Id*.

15

We review sanctions awards for abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). We may reverse a sanctions award only if the trial court that imposed it acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Id*.

## DISCUSSION

As the factual and procedural history of this case might suggest, this appeal is complicated. The Prices, Watson, and Mays initially all filed a joint brief. The Prices subsequently filed an amended brief, but it appears that Watson and Mays intended for the original brief to remain operative as to them. The briefs overlap in certain regards, and Watson's and Mays's brief is difficult to follow. As we understand the arguments, there are five basic issues before us: (1) whether summary judgment against Watson in the first lawsuit was proper; (2) whether dismissal of the Prices from the first lawsuit was proper; (3) whether summary judgment against the Prices in the second lawsuit was proper; (4) whether sanctions against the Prices and Mays were proper; and (5) whether taxing the Prices and Watson for the cost of the audit was proper. We will address these issues in turn. We will not, however, address all of the issues and arguments raised in Watson's and Mays's brief that are not supported with citations to applicable law and to the record. *See Woodside v. Woodside*, 154 S.W.3d 688, 691 (Tex. App.—El Paso 2004, no pet.) (appellant waives issues that are accompanied only by "attenuated, unsupported argument").

Before addressing appellants' properly raised issues, though, we will briefly address an overarching matter: the "ecclesiastical abstention" doctrine. It is axiomatic that courts have no jurisdiction over ecclesiastical matters. *See In re Godwin*, 293 S.W.3d 742, 747-48

16

(Tex. App.—San Antonio 2009, no pet.). The Church and deacons contend, as they did below, that summary judgment was proper because appellants' claims were ecclesiastical in nature and therefore outside the court's jurisdiction. Our review of case law suggests that while this contention might be correct with regard to most of appellants' claims, *see, e.g.*, *id*. at 748-50, it is incorrect with regard to appellants' claim for inspection under Texas Revised Civil Statutes article 1396-2.23. *See Lacy v. Bassett*, 132 S.W.3d 119, 125-26 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (inspection of church books and records under Tex. Rev. Civ. Stat. Ann. art. 1396-2.23 does not implicate ecclesiastical abstention doctrine). Thus, for the sake of conducting a thorough analysis, we will assume that the ecclesiastical-abstention doctrine does not apply to bar any of appellants' claims. Doing so allows us to explain why all of appellants' claims fail even if they are not jurisdictionally barred by the ecclesiastical-abstention doctrine.

### Summary Judgment Against Watson

Watson argues that her suit was not subject to summary judgment because she was statutorily entitled, as a member of the Church, to examine the Church's books and records. Watson made a written demand for inspection in an affidavit appended to the first amended petition. The second amended petition, however, which was Watson's operative pleading at the time of summary judgment, requested not an inspection of the Church's books and records but a declaratory judgment that the Church had violated Texas Revised Civil Statutes article 1396-2.23. *See* Tex. R. Civ. P. 65 (amended pleading supersedes prior pleading); *Zock v. Bank of the Sw. Nat'l Ass'n*, 464 S.W.2d 375, 376 (Tex. Civ. App.—Houston [14th Dist.] 1971, no writ) (amended pleading supersedes both earlier pleading and affidavit supporting it). In other words, the second amended petition did not actually

17

pursue the relief to which Watson now asserts she was entitled.[6]  More importantly, Watson also failed to raise her purported right to inspection in her response to the Church's summary judgment motion.  As a result, we cannot now treat the right to inspection as grounds to reverse the summary judgment.  *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal [of summary judgment]."); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) (party appealing from summary judgment may not raise grounds for reversal that it did not raise in writing in trial court).  In any event, the Church conclusively established that it had satisfied the statutory requirements under article 1396-2.23 by offering Watson the right to examine, producing documents in discovery, and cooperating with the audit.  *See* Tex. Rev. Civ. Stat. art. 1396-2.23.

Watson's request for declaratory relief itself fares no better.  Watson's second amended petition asked the trial court to declare that the Church and deacons violated Texas Revised Civil Statutes article 1396-2.23(A) by failing to keep accurate and complete books and records.  But whether the Church kept accurate and complete books and records was the very issue underlying

----

[6]  In a related matter, as discussed above, the Prices and Watson argued that summary judgment was improper because the Church's 1400-page production contained irregularities that suggested further investigation was warranted.  But because the second amended petition did not actually request further investigation (i.e., did not actually request inspection of the Church's books and records), those irregularities could only have been relevant to the causes of action that the second amended petition actually did contain.  As explained below, however, all of those causes of action fail for independent legal reasons.  Thus, even if we assume that the Church's production did actually contain irregularities, that fact does not suggest that summary judgment was improper.  In other words, because each cause of action actually contained in the second amended petition fails as a matter of law, any irregularities in the Church's production are legally irrelevant.

18

Watson's other causes of action. That is to say, Watson's breach-of-contract, negligence, gross-negligence, and breach-of-fiduciary-duty claims all hinged on the Church's alleged failure to keep accurate and complete books and records. Watson's declaratory-relief claim, then, concerned an issue otherwise before the court. Declaratory relief is not available to settle issues already before the court. *See Howell v. Mauzy*, 899 S.W.2d 690, 706-07 (Tex. App.—Austin 1994, writ denied). As a result, Watson's declaratory-relief claim was subject to summary judgment. *See id*. at 707 (trial court should have granted summary judgment against declaratory-relief claim because it concerned issue already before the court).

The remaining causes of action in the second amended petition were also clearly subject to summary judgment on no-evidence grounds. *See* Tex. R. Civ. P. 166a(i). The second amended petition alleges breach of contract, but the record contains no evidence of any contract between Watson and the Church, let alone evidence of a contract breach resulting in damages to Watson. *See Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73, 82 (Tex. App.—Austin 2003, pet. denied) (elements of breach of contract claim are (1) existence of valid contract; (2) performance by plaintiff; (3) breach by defendant; and (4) damages to plaintiff resulting from breach). Watson suggests that the Church had "contractual duties" under Texas Revised Civil Statutes article 1396-2.23, but the statute says nothing about contracts; it merely imposes bookkeeping responsibilities on corporations. We will not read more into statutes than they plainly contain. *See Lee v. City of Houston*, 807 S.W.2d 290, 295 (Tex. 1991) ("A court may not judicially amend a statute and add words that are not implicitly contained in the language of the statute.").

The second amended petition also alleges that the Church and individual deacons were negligent and grossly negligent in keeping their books and records. Watson failed, however, to present any evidence that the Church or deacons owed her a duty, let alone that they breached that duty and thereby damaged her. *See* Tex. R. Civ. P. 166a(i); *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) (elements of negligence claim are (1) breach of (2) a legal duty owed to another and (3) resulting damages proximately caused by breach); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2009) (elements of gross-negligence claim are (1) objectively high risk of serious injury to plaintiff and (2) defendant's subjective awareness of that risk). Any duty to keep accurate books and records would have existed for the benefit of the Church itself, not its members. *See Texas Soc'y v. Fort Bend Chapter*, 590 S.W.2d 156, 163 (Tex. Civ. App.—Texarkana 1979, writ ref'd n.r.e.) (suits against non-profit corporations by their members are really for corporation's benefit).

The second amended petition states that its cause of action for conversion applies only to the Prices, so we will not address that cause of action here. The petition does not state that its cause of action for intentional infliction of emotional distress applies only to the Prices, but nowhere in the record does Watson suggest that she suffered emotional distress.[7] Even if we assume that the intentional-infliction-of-emotional-distress cause of action also applied to Watson, Watson clearly failed to produce any evidence to create an issue of material fact. *See* Tex. R. Civ. P. 166a(i); *Texas Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 610 (Tex. 2002) (elements of claim of

---

[7] The Prices, on the other hand, alleged in affidavits attached to the second amended petition that they experienced emotional distress as a result of their conflicts with the Church.

20

intentional infliction of emotional distress are (1) defendant acted intentionally or recklessly; (2) defendant's conduct was extreme and outrageous; (3) defendant's actions caused plaintiff emotional distress; and (4) plaintiff's emotional distress was severe). For example, there is no evidence that Watson suffered emotional distress, let alone severe emotional distress, or that the Church's or deacons' conduct was extreme or outrageous towards Watson.

Finally, the second amended petition alleges that the Church and deacons breached a fiduciary duty to Watson. This cause of action necessarily fails because churches do not have fiduciary duties to their members. *See Hawkins v. Trinity Baptist Church*, 30 S.W.3d 446, 453-53 (Tex. App.—Tyler 2000, no pet.). And even if churches could have such duties under special circumstances, Watson presented no evidence that such circumstances existed here. Indeed, the only evidence allegedly supporting Watson's fiduciary-duty claim was affidavits executed by the Prices, attached to the second amended petition, that conclusorily asserted that all Church members were joint venturers and therefore owed each other fiduciary duties. Such conclusory assertions are, however, not evidence at all, *see In re American Home Prods. Corp.*, 985 S.W.2d 68, 74 (Tex. 1998), and there was nothing else in the record to support that Church members were joint venturers.

In sum, each of Watson's causes of actions fails as a matter of law. Watson argues that the trial court should have allowed her more time to conduct discovery before ruling on the Church's summary-judgment motion, but Watson's causes of action failed as a matter of law under circumstances indicating that further discovery would have been pointless. The trial court therefore properly entered summary judgment against Watson.

***Dismissal of the Prices from the First Lawsuit***

The trial court granted the Church's plea to the jurisdiction in the first lawsuit and dismissed the Prices. On appeal, the Prices argue that this dismissal was error. We decline to reach this issue, however, because it is moot.

After the Prices were dismissed from the first lawsuit, they filed a second lawsuit against the deacons while Watson continued the first lawsuit against the Church. The two lawsuits were eventually consolidated, and the Prices and Watson jointly filed a second amended petition. As a result, the effect of the Prices' dismissal from the first lawsuit was nullified; indeed, in their motion to consolidate, the Prices admitted that "[t]he issues of fact and law in both district court actions are the same." Therefore, the Prices' dismissal from the first lawsuit is moot. *See Zipp v. Wuemling*, 218 S.W.3d 71, 73 (Tex. 2007) (issue is moot "when a court's action on the merits cannot affect the rights of the parties"). We cannot consider moot issues. *See Camarena v. Texas Employment Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). As a result, we do not reach whether the Prices' dismissal from the first lawsuit was error.

***Summary Judgment Against the Prices***

The Prices, like Watson, argue that they were entitled to more time for discovery before summary judgment. We have already explained why this argument fails for their breach-of-contract, negligence, gross-negligence, and fiduciary-duty causes of action. Here we will explain why it also fails for their conversion and intentional-infliction-of-emotional-distress causes of action.

To maintain a cause of action for conversion, "a plaintiff must show (1) title, (2) right to possession, and (3) a demand for return of the property unless the possessor's acts manifest a clear

repudiation of the plaintiff's rights." *El Paso Prod. Co. v. Valence Operating Co.*, 112 S.W.3d 616, 625 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). In the second amended petition, the Prices admit that they "donated" their allegedly converted property to the Church. As a result, they lost title to and the right to possess the property, and their conversion claim is clearly unsustainable on traditional or no-evidence grounds. *See Klein v. Hartzell*, 43 S.W.2d 131, 131 (Tex. Civ. App.—San Antonio 1931, writ ref'd) (property donor loses title to and right to possess property).

As already discussed, to maintain a claim for intentional infliction of emotional distress, a plaintiff must show that he or she suffered severe emotional distress because of the defendant's intentional or reckless engagement in extreme and outrageous behavior. *See Sears*, 84 S.W.3d at 610. The only evidence of emotional distress offered by the Prices was self-serving statements contained in the affidavits that they attached to the second amended petition. Even taking these statements as true, these statements do not create a material fact issue because there was no evidence to support that the Church's and deacons' behavior was extreme or outrageous. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006) (conduct is extreme and outrageous "only if it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (quotation marks and citations omitted). "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Id*. Thus, the trial court did not err in granting summary judgment on the Prices' cause of action for intentional infliction of emotional distress. *See* Tex. R. Civ. P. 166a(i).

In sum, summary judgment was proper on each of the Prices' claims in the second amended petition.

*Sanctions Against the Prices and Mays*

The Church and deacons sought sanctions under Texas Rule of Civil Procedure 13 ("Rule 13") and Texas Civil Practice and Remedies Code chapter 10. The trial court awarded them sanctions in an amount equal to their costs and attorney's fees. The court made the Prices and their attorney, Mays, jointly and severally liable for the sanctions. The Prices and Mays appeal that decision.

Rule 13 allows a court, "upon motion or upon its own initiative," to impose sanctions on a party, its attorney, or both for filing a groundless instrument in bad faith or for the purpose of harassment. Tex. R. Civ. P. 13. Under the Rule,

> the signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment.

*Id*. The Rule defines "groundless" as having "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id*. The sanctions that may be imposed are enumerated in Texas Rule of Civil Procedure 215.2(b), *see id*., and they include costs and attorney's fees incurred to defend against the groundless suit. *See* Tex. R. Civ. P. 215.2(b)(8).

Chapter 10 of the Texas Civil Practice and Remedies Code also allows a court to sanction both parties and their attorneys. *See* Tex. Civ. Prac. & Rem. Code § 10.004(a). It states:

24

The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:

(1)  the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2)  each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3)  each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

*Id*. § 10.001.  The court may issue sanctions under chapter 10 upon motion or upon its own initiative.

*Id*. § 10.002(b).  The sanctions may include "an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees." *Id*. § 10.004(c)(3).

We hold that the trial court did not abuse its discretion in awarding sanctions against the Prices under Rule 13 as well as under chapter 10 of the Civil Practice and Remedies Code. *See Low*, 221 S.W.3d at 614.  The trial court recited several bases for the sanctions award, including:

- In the first lawsuit, the Prices falsely claimed that they had been denied access to the Church's financial records;

- The Prices exploited the Church's lack of knowledge that the first petition had been filed to obtain a default Order of Audit on May 25, 2005;

25

- The Prices joined Watson in the first lawsuit solely to defeat the Church's plea to the jurisdiction;

- The Prices' lawsuit against the individual deacons consisted of a "constellation of hopelessly inapplicable legal theories";

- The Prices sued the deacons who were active at the time the Prices were expelled from the Church, not the deacons who were active at the time of the Church's alleged financial improprieties;

- The claims contained in the Prices' second amended petition had no basis in law or fact;

- The court-ordered audit of the Church's finances uncovered no evidence of fraud or mismanagement;

- The second amended petition alleged that the Prices had been denied access to the Church's books and records when in fact the Church had produced roughly 1400 pages of records;

- The Prices made false allegations in the affidavits that they attached to the second amended petition;

- The Prices tried to trick the Church into accepting a donation check in October of 2005, well after their first suit was under way; and

- The Prices' lawsuits were a pretense, designed to make good on threats of harassment that the Prices made against the Church because of ecclesiastical disagreements.

These findings justify the imposition of sanctions under Rule 13 because they show that the pleadings the Prices filed were groundless and filed in bad faith and for the purpose of harassment. These findings also justify the imposition of sanctions under chapter 10 of the Civil Practice and Remedies Code because they show that the Prices (1) filed pleadings to harass and cause needless increase in the cost of litigation; (2) made claims that were not warranted by existing law or by nonfrivolous arguments for the extension, modification, or reversal of existing law or the establishment of new law; and (3) made allegations and factual contentions that lacked evidentiary

26

support. Though the findings listed above are sufficient to justify the imposition of sanctions, we also note that the Prices and Watson, through Mays, rebuffed multiple efforts by the Church to end the parties' dispute.[8]  For example, on April 28, 2005, the Church offered to allow the Prices to inspect and copy the records that were relevant to their expressed concerns.  The Prices did not respond, nor did they inform the Church or its attorneys that they had filed suit just two days earlier. And in a letter dated September 1, 2005, the Church offered Watson unrestricted inspection and copying of its records.  Watson ignored this offer and filed a motion to compel production of those records roughly one week later.  Thus, the record suggests not only that the Prices and Watson lacked any legal basis for various allegations and claims, but also that they were more interested in litigating than they were in actually inspecting the Church's financial records.  Under such circumstances, the trial court was well within its discretion to impose sanctions.

The Prices and Mays argue not only that sanctions should not have been imposed, but also that the amount of sanctions imposed was excessive.  We disagree.  The court imposed sanctions equal to the Church's and deacons' costs and attorney's fees.[9]  Rule 13 and chapter 10 of the Civil Practice and Remedies Code both allow for costs and attorney's fees as a measure of sanctions.  *See* Tex R. Civ. P. 13 (incorporating Tex. R. Civ. P. 215.2(b)); Tex. R. Civ. P.

---

[8]  These efforts belie Mays's argument that the Church did not attempt to mitigate its litigation expenses.

[9]  The Prices and Mays argue that the Church's and deacons' attorneys did not properly substantiate their fees, but "proof of the necessity or reasonableness of attorney's fees is not required when the fees are assessed as sanctions." *In re A.S.M.*, 172 S.W.3d 710, 718 (Tex. App.—Fort Worth 2005, no pet.).  In any event, the Church's and deacons' attorneys testified and submitted affidavits as to the fees they charged their clients.

27

215.2(b)(8); Tex. Civ. Prac. & Rem. Code § 10.004(c)(3). In fact, the Texas Supreme Court has stated that

> the determination of the amount of a penalty to be assessed under Chapter 10, which is not limited to attorney's fees and costs, should nevertheless begin with an acknowledgment of the costs and fees incurred because of the sanctionable conduct. This provides a monetary guidepost of the impact of the conduct on the party seeking sanctions and the burdens on the court system.

*Low*, 221 S.W.3d at 621. Thus, the amount of sanctions the trial court imposed was proper.

The Prices and Mays also contend that the Church was not entitled to recover any of its attorney's fees because the Church did not segregate its attorney's fees between the first and second lawsuit. For this argument to be availing, sanctions would have had to have been appropriate in only one of the lawsuits. As discussed above, however, the Prices and Mays filed pleadings in both lawsuits (as well as the consolidated suit) that the trial court could reasonably view as sanctionable. In any event, this argument is waived because it was not raised in the trial court. *See Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988).

Additionally, the Prices and Watson argue that the Church was not entitled to recover attorney's fees because its insurer actually paid its legal bills. Sanctions may be imposed to discourage further frivolous litigation, though, *see* Tex. Civ. Prac. & Rem. Code § 10.004(b),[10] not only to compensate a party for its out-of-pocket legal expenses, so it is irrelevant that the Church's insurer paid the Church's attorney's fees. Furthermore, attorney's fees are in fact recoverable even if paid by an insurer. *See Aviles v. Aguirre*, 292 S.W.3d 648, 649 (Tex. 2009) (per curiam).

Finally, Mays contends that he did not receive adequate notice before being

---

[10] The trial court explicitly noted that it was imposing sanctions to discourage the Prices from filing additional frivolous lawsuits.

28

sanctioned. *See* Tex. R. Civ. P. 13 (sanctions may be imposed only after notice and hearing); Tex. Civ. Prac. & Rem. Code § 10.003 (same). At the hearing on the sanctions motion, after the Church sought to admit the August 26, 2005 letter in which it offered to pay for an audit, the following exchange occurred:

> THE COURT: Are you seeking personal sanctions against the lawyer as well as the clients here? Rule 13 allows that. I'm just curious.
>
> MS. BENAVIDES: Your Honor, we're seeking all sanctions that are available to the church, yes.
>
> THE COURT: Then [the letter is] admitted to show the correspondence between the attorneys in the case.
>
> (Movant's Exhibit 10 admitted)
>
> MR. MAYS: Your Honor, we would object. This is beyond the scope of the motion for sanctions. We do not waive the pleadings of counsel with respect to the relief which it has—it has requested in the motion for sanctions. And so for the record, we would like the record to show that we would not waive our objection to the relief which is requested in the motion for sanctions or the first amended motion for sanctions. We intend to hold the defendants to proof of the relief which—for which they have requested.
>
> THE COURT: Well, let me see. They did cite Rule 13, did they not? Did you file any special exceptions to their citation of Rule 13 concerning who the parties of the Rule 13 sanction would be?
>
> MR. MAYS: The response which I filed, Your Honor, is the response which I have provided to the Court.
>
> MS. BENAVIDES: Your Honor, Page 14 of the motion in the prayer asks for all other relief of law or equity to which defendants may be justly entitled.
>
> THE COURT: 13 or 14?
>
> MS. BENAVIDES: I believe it's Page 14 of the amended motion, the very last sentence.

29

THE COURT: It might be, and it's covered up by your big old plant here. No, there's nothing on Page 14 of what I'm looking at. No, it's on 13.

MS. BENAVIDES: It is the very last substantive page.

THE COURT: Yes, I'm reading it. All other relief of law and equity to which plaintiffs are justly entitled. Rule 13 contemplates sanctioning of the lawyer. And there is no special exception. Your objection is overruled.

. . . .

MR. MAYS: Your Honor, for the record, plaintiffs wish to assert surprise at this point. Request that this hearing be recessed and give us an opportunity to respond to the modification to the plaintiffs' amended motion for sanctions which—

THE COURT: I didn't hear any modifications. They didn't ask for a trial amendment. They're relying on the pleadings that are before the Court. I don't believe you're entitled to a continuance on that.

MR. MAYS: Again, Your Honor, for the record, we would request a continuance at this point.

THE COURT: Denied.

As this exchange shows, Mays did not clearly and specifically complain that he received inadequate notice that the Church was seeking sanctions against him personally. Indeed, it is not even clear on whose behalf Mays is attempting to object; Mays repeatedly uses the pronoun "we" rather than "I," and he states that "*plaintiffs* wish to assert surprise." (Emphasis added.) Moreover, Mays does not specifically tie that purported surprise to a lack of notice, nor does he explain how the sanctions motion provided inadequate notice. We therefore think Mays failed to object to the purported lack of notice with sufficient specificity to preserve it as a point of error. *See* Tex. R. App. P. 33.1(a)(1)(A) (to preserve complaint for appellate review, appellant's trial-court objection must be sufficiently specific to make trial court aware of complaint). *Cf. Vargas*

30

*v. Vargas*, 930 S.W.2d 725, 728 (Tex. App.—Houston [1st Dist.] 1996, no writ) (attorney waived objection to personal sanctions where he objected only on client's behalf, not his own).

But even if we assume that Mays objected with sufficient specificity to his purported lack of notice, we still think Mays received sufficient notice to render his objection meritless. Mays's argument that he received insufficient notice turns on the fact that the sanctions motion named only the "plaintiffs" as its target. In his brief, Mays argues that "[d]efendants must specifically implead counsel for plaintiffs in the body of the motion for sanctions," rather than just the plaintiffs themselves, to be able to recover sanctions against him. Mays cites no case law that supports this proposition.[11] He is of course correct that he was entitled to notice that he was subject to the pending sanctions motion, but, as the trial court noted, the sanctions motion specifically invoked Rule 13 and chapter 10 of the Civil Practice and Remedies Code and then requested "all . . . relief of law and equity to which defendants may be justly entitled." Rule 13 and chapter 10 both explicitly provide for sanctions against attorneys who file groundless pleadings on behalf of their clients. Furthermore, several of the grounds for sanctions explicitly listed in the sanctions motion were acts performed by Mays himself.[12] Thus, we believe Mays had sufficient notice that he was a target of the sanctions motion. *Cf. Braden v. South Main Bank*, 837 S.W.2d 733, 738 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (attorney had notice that his conduct during

---

[11] Mays cites two cases, *City of Austin v. Castillo*, 25 S.W.3d 309, 314 (Tex. App.—Austin 2000, pet. denied), and *Texas Indus., Inc. v. Vaughan*, 919 S.W.2d 798, 803 (Tex. App.—Houston [14th dist.] 1996, writ denied), that are not on point.

[12] For example, Mays signed all the pleadings that the Church and deacons considered frivolous.

discovery subjected him to sanctions even though motion seeking sanctions for discovery abuses did not specifically name him as target).[13]

Mays also claims that his lack of notice violated his right to due process. His entire argument in support of this contention is the following brief passage: "Counsel for plaintiffs was never given notice and an opportunity for a hearing on the sanctions assessed against him. The actions of the Court violate the Amendments, Art. XIV, Section 1, the Constitution of the United States of America." We deem this argument waived because it is inadequately briefed. *See Woodside*, 154 S.W.3d at 691 (appellant waives issues that are accompanied only by "attenuated, unsupported argument"). For the same reason, we deem waived the argument that sanctions were unwarranted because the deacons never properly "hired" the Church's counsel for the second suit. This "argument" consists entirely of a three-line quotation from the record in Mays's and Watson's brief that is accompanied by neither explication nor citation to authority.

In sum, the trial court did not abuse its discretion in issuing the April 26, 2007 sanctions order. It did, however, exceed its power in issuing the August 23, 2007 sanctions order because, as discussed above, the court's plenary power had expired by then.[14] *See Scott & White Mem'l Hosp. v. Schexnider*, 940 S.W.2d 594, 596 (Tex. 1996) (per curiam) ("A trial court's power to decide a motion for sanctions . . . is limited to when it retains plenary jurisdiction."). That order

---

[13] *Zep Mfg. Co. v. Anthony*, 752 S.W.2d 687 (Tex. App.—Houston [1st Dist.] 1988, orig. proceeding) (per curiam), cited by the Prices, is not to the contrary. The "sole issue" in *Zep* was "whether a trial court may sua sponte order sanctions *when there is no motion for sanctions before the court*, and no notice has been given that sanctions may be imposed." *Id*. at 688 (emphasis added). Here, of course, a motion for sanctions *was* before the court, it specifically discussed many acts that Mays had performed, and it was duly served on Mays.

[14] The Church conceded this point in oral argument.

is therefore void, so the Church and deacons are not entitled to recover the sanctions that the August 23, 2007 order purported to award them.

### *Taxing Audit Costs Against the Prices and Watson*

The trial court held the Prices and Watson jointly and severally liable for the cost of the audit of the Church's records. The Prices and Watson argue that this was error because (1) the audit did not conclusively establish that the Church did not commit financial fraud, (2) the audit report was not proper evidence because it did not satisfy the requirements of Texas Rule of Evidence 706 and Texas Rule of Civil Procedure 172, and (3) the cost of the audit was not properly substantiated.

The Prices and Watson cite no authority indicating that a trial court may only tax a plaintiff for the cost of an audit if the audit reveals wrongdoing by the defendant. In fact, courts have discretion in allocating costs, *see* Tex. R. Civ. P. 141, and their default position is to allocate costs to the losing party. *See* Tex. R. Civ. P. 131 ("The successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided."). This rule applies to the cost of a court-appointed auditor. *See Villiers v. Republic Fin. Servs., Inc.*, 602 S.W.2d 566, 571-72 (Tex. Civ. App.—Texarkana 1980, writ ref'd n.r.e.). Thus, the trial court did not err in taxing the Prices and Watson for the cost of the audit, regardless of whether or not the audit established fraud to their satisfaction.[15]

---

[15] Though we have not found a case in which a court appointed an auditor specifically to resolve a suit brought under Texas Revised Civil Statutes article 1396-2.23, we note that (1) appellants do not challenge the trial court's authority to order the audit, and (2) our holding accords with the portion of the statute that requires the party seeking an inspection to pay the associated costs. *See* Tex. Rev. Civ. Stat. Ann. art. 1396-2.23(B) (West 2003).

Regarding the Prices' and Watson's second argument, we do not believe that Texas Rule of Evidence 706 and Texas Rule of Civil Procedure 172 apply here. Evidence Rule 706 applies only when Rule 172 applies, *see* Tex. R. Evid. 706, and Rule 172 applies when "an investigation of accounts or examination of vouchers appears necessary for the purpose of justice between the parties." Rule 172 goes on to clarify that "accounts" means "the account between the parties." This indicates that audits occur pursuant to Rule 172 only when parties dispute a debt between them, not when a party merely seeks review of a corporation's recordkeeping practices. Moreover, the trial court did not indicate that it was ordering an audit pursuant to Rule 172, and no party requested an audit pursuant to Rule 172. Indeed, the Prices and Watson did not invoke Rule 172 until after the audit was completed.

Regarding the Prices' and Watson's third argument, the audit's cost was ultimately properly substantiated. The record shows that before the audit occurred, the Church paid $18,750 into the court's registry to cover the audit's estimated cost. The record originally submitted to this court did not substantiate that the audit actually cost that much or that the auditors ever received that money. Rather, the only relevant documentation in the record was an audit invoice for $2,630.08. After oral argument, however, we received a supplemental record from the trial court clerk that substantiated the audit's cost and showed that the money in the court's registry had actually been paid out to the auditors. *See* Tex. R. App. P. 34.5(c) (trial court clerk may file supplemental record containing relevant omitted items with appellate court). The supplemental record contained copies of invoices submitted by the auditors to the court and a check from the court to the auditors in the amount of $18,700. The Prices and Watson object to the submission of the supplemental record, arguing that it represents an impermissible attempt to enlarge the trial court record. *See Disco Mach.*

34

*of Liberal Co. v. Payton*, 900 S.W.2d 71, 74-75 (Tex. App—Amarillo 1995, writ denied) ("Leave to supplement merely encompasses permission to augment the appellate record with the *existing* trial court record; it does not allow the creation of a *new* trial court record."). They also claim, without supporting argumentation or citation to authority, that the Church is estopped by laches from supplementing the record. Finally, they state that because they had never seen the documents in the supplemental record before the clerk filed it, the Church must have violated Texas Rule of Civil Procedure 21. *See* Tex. R. Civ. P. 21 (copy of "[e]very pleading, plea, motion or application to the court for an order" must be served on all parties).

These arguments do not persuade us to deny the Church leave to file the supplemental record. First, the supplemental record contains items that were already on file with the trial court; thus, it does not represent an impermissible "enlargement" of the trial court record. Second, the laches contention is waived because it is unsupported by argument or citation to authority. *See Woodside*, 154 S.W.3d at 691. Third, Texas Rule of Civil Procedure 21 does not apply to the documents in the supplemental record because they are invoices and a check, not pleadings, pleas, motions, or applications to the court for orders. *See* Tex. R. Civ. P. 21. Moreover, the auditors, not the Church, filed the invoices with the court, so it is hard to see how the filing of those invoices could have imposed duties on the Church pursuant to Rule 21. But even if Rule 21 did apply to the documents in the supplemental record, the Prices, Watson, and Mays have offered no argument or authority explaining why exclusion of the documents from the record is the proper remedy for the Church's alleged violation of Rule 21. Thus, we grant the Church's motion to admit the supplemental record, and on the basis of the documents in that record we affirm the order requiring the Prices and Watson to reimburse the Church $21,380.08 for the audit. *See Silk v. Terrill*,

35

898 S.W.2d 764, 766 (Tex. 1995) (per curiam) (appellate court has broad discretion to allow supplementation of record).

## CONCLUSION

For the reasons stated above, we affirm the summary judgments against the Prices and Watson. We affirm the trial court's April 26, 2007 sanctions order and vacate its August 23, 2007 sanctions order. Finally, we affirm the court's March 28, 2007 order requiring the Prices and Watson to reimburse the Church for the full cost of the audit.

_____

David Puryear, Justice

Before Justices Patterson, Puryear and Henson

Affirmed in part; Vacated in part

Filed:   May 20, 2010